# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SEAH CHEE WEI,

                    Plaintiff,

v.                                                                    Case No. 16-CV-1282-JPS

ROCKY POINT INTERNATIONAL LLC,

                                                                            **ORDER**

                    Defendant.

 

This case is animated by both a Wisconsin lake house and an oil rig located in the Indian Ocean. The purchase of the rig went awry, and Plaintiff Seah Chee Wei ("Seah"),[1] liquidator of the rig's prospective buyer, Traxiar Drilling Partners II Pte., Ltd. ("Traxiar"), alleges that several million dollars of Traxiar's funds were stolen. Those funds were transferred to several Texas entities before ending up in the possession of Defendant Rocky Point International, LLC ("Rocky Point"). Rocky Point used the money to renovate a lake house in Pewaukee, Wisconsin.

Seah asks the Court to undo the allegedly fraudulent transfers, while Rocky Point counters that all of the transactions at issue were legitimate. Before the Court is Seah's motion for partial summary judgment on his claims of constructive fraudulent transfer and constructive trust. (Docket #53). The motion is fully briefed and, for the reasons stated below, it must be denied.

---

[1]In Singapore, family names are given first.

1.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

2.    **RELEVANT FACTS**

The Court has several times reviewed the complex series of events giving rise to this litigation. *See Seah v. Rocky Point Int'l, LLC*, Case No. 16-CV-1282-JPS, 2016 WL 7046802, at *1–2 (E.D. Wis. Dec. 2, 2016); *Seah v. Rocky Point Int'l LLC*, Case No. 16–CV–1282–JPS, 2017 WL 74263, at *1–2

(E.D. Wis. Jan. 6, 2017). In this Order, the Court will confine itself to the facts necessary to disposition of the present motion. The interested reader may consult the prior opinions for additional background information.

### 2.1 The *Somnath* and the Symphony-Traxair Loan Agreement

Traxiar is a foreign corporation located in the Republic of Singapore. Pursuant to an order dated June 3, 2015, the High Court of Singapore appointed Seah and Tan Suah Pin as the liquidators of Traxiar.[2] The order provided for winding down the business affairs of Traxiar and vested in the liquidators authority to exercise any of the powers and entitlements of liquidators conferred by Section 272(1) of the Singapore Companies Act.

Dag Oivind Dvergsten ("Dvergsten") is a Norwegian businessman. From the time of Traxiar's inception until at least April 23, 2015, Dvergsten was a director of Traxiar. He is also the sole director of Rocky Point and has authority to act on its behalf.

On or about December 23, 2013, Symphony Ventures Pte. Ltd. ("Symphony") entered into a loan agreement for $15 million with Traxiar in order to finance the down payment on the *Somnath*, an oil rig located in Qatar. The agreement provided for the $15 million to be made available to Traxiar in two parts. The first tranche of $6 million was to be made available on or before December 31, 2013. The second tranche of $9 million was to be made available after there was confirmation that adequate security for the *Somnath* had been created. Symphony was to send the two

---

[2]Tan resigned and the Singapore Court approved the resignation on April 18, 2017. She is no longer a party to these proceedings. (Docket #48).

payments to a bank account owned by Dag Dvergsten Pte., Ltd. ("DDPTE") (which is owned by Dvergsten) because Traxiar did not maintain a bank account at the time. Once it did have an account, DDPTE was to transfer the funds to Traxiar.

## 2.2    The Transfers

On December 26, 2013, Symphony advanced the first tranche to Traxiar by transferring $6 million to a bank account owned by DDPTE. However, DDPTE never paid the money to Traxair as promised. On December 27, 2013, DDPTE wired $3.25 million to TY Global, LLC ("TY Global"), a company located in Houston, Texas. On December 27, 2013, TY Global received $3,249,975 from DDPTE in its account ending in '5357 at Bank of America.[3] On December 30, 2013, TY Global wired $2.25 million to AT Offshore, LLC ("AT Offshore"), another Houston company. On December 31, 2013, AT Offshore received the $2,250,000 in its bank account at Wells Fargo Bank ending in '8565. On January 3, 2014, AT Offshore wired $2 million to Rocky Point. All of these transactions were completed by electronic wire transfer.

---

[3]Here and elsewhere, Rocky Point responded to Seah's statement of fact by stating, without citation to evidence, that it "cannot admit or deny" the proffered fact. (Docket #65 at 3). This is a textbook case of failure to meaningfully respond to a proffered fact as required by the federal and local Rules, which dictate that a dispute as to a material fact must be supported by citation to a specific part of the record substantiating the dispute. *See* Fed. R. Civ. P. 56(c); Civ. L. R. 56(b)(2)(B)(i); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."). The Court considers such a response an admission of the fact in question. *See* Fed. R. Civ. P. 56(e); Civ. L. R. 56(b)(4).

### 2.3 The Brokerage and Cash Pooling Agreements

Seah says that all of these transfers were without justification and were done to defraud the creditor, Symphony. He notes that prior to June 22, 2017, AT Offshore had no transactions involving Traxiar other than receiving the $2.25 million from TY Global. Seah asserts that, similarly, TY Global's only transaction involving Traxiar was its receipt of the initial $3.25 million from DDPTE. (Docket #65 at 4–5).

Rocky Point disputes this assertion, claiming that the transfers were predicated on a brokerage agreement dated October 7, 2013—prior to the transfers—through which Dvergsten hired brokers to negotiate Traxiar's purchase of the *Somnath*. *Id.*; (Docket #56-6 at 5); (Docket #63-13). Rocky Point contends that there were three brokers hired pursuant to the agreement: Abraham Thomas ("Thomas"), owner of TY Global and AT Offshore, Siddhartha Roy ("Roy"), and Raman Mullick ("Mullick"). (Docket #65 at 4–5); (Docket #65-15 at 6–9). According to Rocky Point, "[t]hey did significant work and the money transferred was in payment for these services[.]" (Docket #65 at 4–5); (Docket #56-6 at 5). Dvergsten testified regarding their work, *see* (Docket #65-15 at 8–26), and Rocky Point submitted several emails involving Dvergsten, Thomas, Roy, and Mullick on the topic of the *Somnath* purchase, *see, e.g.*, (Docket #63-19, #63-20, #63-21, #63-22, #63-23, #63-24, #63-25, #63-26, #63-27, #63-28).

Rocky Point explains that under a verbal agreement, the brokers' fees were paid up front in exchange for their promise to immediately reinvest their commissions into the purchase of the *Somnath* to provide equity for the transaction. (Docket #63-15 at 6–9). The reinvestment was to

occur by transferring the funds to Rocky Point, an entity designated and controlled by Dvergsten. *Id.* at 2, 8. Their commissions and fees totaled $3.25 million and are reflected in two contemporaneous invoices prepared by TY Global before the transfers were made. *See* (Docket #63-14). Rocky Point maintains that the $2 million it ultimately received is owed to Roy and Mullick for their brokerage services. (Docket #65 at 6–7); (Docket #73 at 3).[4]

Rocky Point contends that it was designated to receive the transfer from AT Offshore because it was party to a cash pooling agreement between several of Dvergsten's controlled companies. *See* (Docket #63-10 at 13). Rocky Point further states that although the relationship between AT Offshore and TY Global is "unclear," the transfer between those two entities was also part of the reinvestment agreement. *See* (Docket #65 at 6–7). The parties do not dispute that whatever its role may have been, AT Offshore "never owned the money it deposited." (Docket #73 at 3). It seems that Thomas chose AT Offshore as a conduit through which to send the funds from TY Global to Rocky Point for reinvestment, but the reasons for his choice are not apparent.

In contrast to Rocky Point's version of events, Thomas averred that in exchange for the $2.25 million transfer from TY Global to AT Offshore and the $2 million transfer from AT Offshore to Rocky Point, the transferors—TY Global and AT Offshore—received nothing of any

---

[4]In what became a separate dispute not at issue in this action, Thomas appears to have kept his portion of the brokerage commission rather than transfer it on to its intended destination, Rocky Point. This is why less than the entirety of the original $3.25 million made it to Rocky Point.

monetary value from anyone. Rocky Point's books show the AT Offshore $2 million transfer as a debt that Rocky Point owes to AT Offshore. Rocky Point explains that while this is what the ledger says on its face, it is only because AT Offshore is the entity that transferred the money. (Docket #65 at 6). Again, Rocky Point believes that the $2 million is owed to Roy and Mullick. *Id.* at 6–7; (Docket #73 at 3); (Docket #63-16 at 5–6).

Seah calls the brokerage agreement a "sham," claiming that there is no evidence that Traxair, Dvergsten, or Rocky Point ever retained Roy or Mullick. (Docket #73 at 1). Thomas himself averred that TY Global's invoices were prepared at Dvergsten's direction and that no brokerage services were ever rendered. (Docket #5-1 at 1–2). Further, he stated that there was "no legitimate business reason" for AT Offshore to pay $2 million to Rocky Point, as they have no business dealings. *Id.* The transfer was again done solely at Dvergsten's request. *Id.*

Seah also points to Dvergsten's deposition testimony, in which he admits that Roy and Mullick were not mentioned in the brokerage contract with TY Global. (Docket #73-2 at 6). Dvergsten nevertheless claims that these men performed valuable work and that they were mentioned in emails he had with Thomas. *Id.*; (Docket #65-15 at 6). Essentially, Dvergsten understood that Roy and Mullick worked for TY Global, not himself or Traxair directly. *See* (Docket #73-2 at 6). Again, Seah views Dvergsten's belief that the $2 million was owed to Roy and Mullick as a phony reason to make the transfer appear legitimate. Dvergsten had no reason to care about payments to brokers who did not contract directly with him and his gratuitous concern for their fee is, to Seah's mind,

disingenuous. *See id.* at 7–9. Also of note to Seah is the fact that neither Roy nor Mullick have ever asked for their commissions. *Id.* at 8.

### 2.4 The Financial Circumstances

Seah states that, based on a review of Traxair's financial records, as of December 27, 2013, when Traxiar through DDPTE transferred $3.25 million to TY Global, Traxiar's debts exceeded its assets at a fair valuation by at least $18,128. Rocky Point denies this, pointing out that the balance sheet Seah cites is from December 31, 2013—four days after the transfer. (Docket #65 at 5).

As of December 30, 2013, when TY Global transferred $2.25 million to AT Offshore, TY Global had no assets except for one account at Bank of America ending in '5357, which had $92,223.37 after the transfer. On January 3, 2014, immediately after the $2 million transfer to Rocky Point, AT Offshore had no assets except for two accounts at Wells Fargo ending in '8547 and '8565. Those accounts had $22,699.16 and $225,010.24, respectively.[5]

### 2.5 The Lake House

Out of the $2 million transfer from AT Offshore, Rocky Point paid a total of $1,910,070.78 in improvements on the Pewaukee lake house, including construction, renovation, landscaping, mortgage payments, and insurance. Rocky Point does not dispute any individual payment or the sum thereof, but responds that statements regarding the payments "mischaracteriz[e] the facts" since "[t]he money was used pursuant to

---

[5]Here the Court finds another of Rocky Point's frivolous factual denials: "Rocky Point objects that this proposed fact is irrelevant to this cause, and Rocky Point cannot admit or deny this fact." (Docket #65 at 5–6).

[the] cash pooling agreement. The money was allowed to be used across multiple entities by agreement." (Docket #65 at 7–8); (Docket #73 at 3).

### 2.6 The Texas Action and Default Judgment

On May 30, 2017, the United States District Court for the Southern District of Texas entered a default judgment on claims brought by Seah against TY Global in the amount of $1 million for actual damages, and against TY Global and AT Offshore, jointly and severally, in the amount of $2.25 million for actual damages, $2,174.22 in costs, and $34,373.75 for attorney's fees.[6] The complaint on which the Texas court granted the default judgment alleged similar claims arising from the same transfers at issue in this action.

### 2.7 The Singapore Action

During the pendency of this case, another suit has been proceeding between Traxair's liquidators and Dvergsten in Singapore. Within that suit were claims that the transfers underlying this case, including those that occurred in the United States, were fraudulent and that Dvergsten made fraudulent misrepresentations to Symphony. On June 30, 2017, the Singaporean court issued a written decision after a trial. The judge determined that, based on the evidence adduced, Dvergsten had not acted with the intent to defraud Traxair's creditors. His decision reads, in relevant part:

> Fraud is not easily made out, though I note the criminal
> standard is required. Here, the primary question was one of

---

[6]Rocky Point's response to this and several following statements of fact is that it "does not agree with the findings in [the Texas] judgment," but cites no evidence whatsoever. Again, such cursory disputes will be ignored. *Smith*, 321 F.3d at 683.

the knowledge of the Defendant. The inference of this had to be drawn from the evidence. While I do find that there was [sic] some areas of concern, this was not in the end sufficiently strong for me to find knowledge of fraudulent intent even on the civil standard. There were other explanations, including sheer recklessness or negligence, or just willful disregard. But in the context of the evidence before me, I could not find knowing participation by the Defendant.

(Docket #63-1 at 9–10). The court did, however, award the liquidators nearly $8 million USD in damages resulting from Dvergsten's breaches of his directorial duties. *Id.* at 9–11.

**3. ANALYSIS**

Plaintiff seeks only partial summary judgment, asking the Court to find that the transfers at issue in this case were constructively fraudulent, in violation of the Wisconsin Uniform Fraudulent Transfers Act ("WUFTA"), Wis. Stat. § 242.01 *et seq.*, and therefore avoidable, *see id.* § 242.07. As a corollary to that finding, Plaintiff requests that the Court impose a constructive trust against the Pewaukee lake house. Layered on top of these questions is Rocky Point's assertion that the recent judgment by the Singaporean judge precludes any finding of fraud in this case. The Court will first address the factual disputes that remain as to the fraudulent transfer claims, as that obviates the need for a discussion of remedy.

**3.1 Constructive Fraud Under WUFTA**

Seah argues that the Court can find that the transfers were constructively fraudulent on either of two provisions of WUFTA. The first reads:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Wis. Stat. § 242.05(1). The second provides:

A transfer made or obligations incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> 2. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Id.* § 242.04(1)(b). The primary difference between the two provisions is that, to obtain avoidance, the debtor's financial circumstances need not be as dire at the time of the transfer if the plaintiff becomes a creditor before the transfer is made. Seah also advances the separate claim that the AT Offshore-Rocky Point transfer can be avoided because Rocky Point was a subsequent transferee of TY Global but did not take in good faith and for value. *See id.* § 242.08(2).

Any of these claims may potentially be meritorious. Yet they rest on disputes over the material facts which must be resolved at trial. Despite Seah's vehement protests that Dvergsten has fabricated everything legitimizing these transactions—including the brokerage agreement, the invoices, the reinvestment agreement, and the cash pooling agreement—the Court, construing the evidence in the light most favorable to Rocky Point, cannot agree. Rocky Point has proffered sufficient evidence to raise triable questions of fact on Seah's claims.

All of the WUFTA claims at issue in this motion share a common element: the debtor must have made the transfer in question without receiving "reasonably equivalent value" in exchange. *See id.* §§ 242.05(1), 242.04(1)(b), 242.08(2).[7] That phrase is not expressly defined in the statute.

---

[7] The Court need not exhaustively recount Seah's arguments on each of the other elements of these claims, since Rocky Point's defense centers on the legitimacy of the transactions. It is notable, however, that Rocky Point does not challenge that the transfers occurred. Nor does it dispute that Seah became a creditor prior to the transfers. Specifically, it does not mention or cite any authority to contradict Seah's position that the May 30, 2017 default judgment it obtained in Texas against AT Offshore relates back to the date of the transfer from TY Global to AT Offshore—December 30, 2013—which makes him a creditor before the January 3, 2014 transfer to Rocky Point. *See* (Docket #54 at 3) (citing *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 22 F. Supp. 2d 820, 824 (N.D. Ill. 1998)).

Further, Rocky Point only meekly resists the assertion that AT Offshore became insolvent as a result of the transfer. *See* (Docket #65 at 5). The financial records Seah cites show that AT Offshore had assets of only around $250,000 at the time of the transfer, making it insolvent in light of Seah's outstanding claim of $2.25 million. *Id.* True enough, the balance sheet Seah cites is from four days after the transfer, *id.*, but Rocky Point only speculates that these four days make a difference, *see* (Docket #72 at 5). Summary judgment is the "put up or shut up" moment, *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010), and Rocky Point cannot hew to technicalities like this to create a genuine dispute of fact. Thus, the true focus of the parties' dispute is on the legitimacy of the transactions.

*Badger State Bank v. Taylor*, 688 N.W.2d 439, 445 (Wis. 2004); *Exec. Ctr. III, LLC v. Meieran*, 823 F. Supp. 2d 883, 888 (E.D. Wis. 2011). However, the act provides that "[v]alue is given. . .if. . .property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." Wis. Stat. § 242.03(1).

Additionally, this Court has previously extrapolated the meaning of "reasonably equivalent value" by reference to other definitions provided in WUFTA and the words' plain meanings. *Meieran*, 823 F. Supp. 2d at 888. The Court's construction of the term is that a transferor received "reasonably equivalent value" if the transferee "forgave (1) a 'claim,' broadly defined under Wis. Stat. § 242.01(3), (2) that arose antecedent to the transfer, and (3) that is 'reasonably equivalent' to the value of the transfer." *Id.* Other Wisconsin cases reveal that the receipt of value must be simultaneous with the transfer. *Treter v. Valona*, 706 N.W.2d 703, 2005 WL 2649123, at *4 (Wis. Ct. App. 2005); *Running v. Widdes*, 190 N.W.2d 169, 172 (Wis. 1971).

Interpreting the federal fraudulent transfer statute, 11 U.S.C. § 548, which is identical to the corresponding state statutes, *see Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007), the Seventh Circuit has held that assessing "reasonably equivalent value" requires the court "to determine the value of what was transferred and to compare it to what was received," *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997). There is no fixed mathematical formula for this

inquiry, and the result should depend on the facts of each case. *Id.* A dollar-for-dollar equivalency is not required. *Id.*; *see also In re Pawlak*, 483 B.R. 169, 184 (W.D. Wis. 2012) (interpreting WUFTA and noting that "value" can include "intangible or indirect benefits, even if such things are hard to quantify").

Whether an entity received reasonably equivalent value is normally a question of fact. *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 576 (7th Cir. 1998); *Edinger v. Hazelquist*, 724 N.W.2d 703, 2006 WL 2864522, at *1 (Wis. Ct. App. 2006). Additionally, under Wisconsin law, the plaintiff must prove the elements of a fraudulent transfer, including the failure to receive reasonably equivalent value, by clear and convincing evidence. *Treter*, 706 N.W.2d 703, 2005 WL 2649123, at *3; *Matter of Loyal Cheese*, 969 F.2d 515, 518 (7th Cir. 1992) (interpreting predecessor to WUFTA) (citing *Kerbet v. Behling*, 61 N.W.2d 205, 207 (Wis. 1953)); *Mann v. Hanil Bank*, 920 F. Supp. 944, 950 (E.D. Wis. 1996).

Seah argues that the transfers in this case did not involve the immediate exchange of consideration. Instead, the funds were simply forwarded from one entity to the next without anything being given in return. Thus, he reasons, there was no exchange of reasonably equivalent value. Certainly, the financial records tend to support this theory.

Rocky Point's defense is that although there was no immediate receipt of value, the transfers were justified by prior contractual arrangements. As Rocky Point tells it, the initial transfer from Traxair (through DDPTE) to TY Global was an upfront payment of brokerage fees due to Thomas, Roy, and Mullick. TY Global was then to transmit the

money back to a Dvergsten-controlled entity so that it could be reinvested into the purchase of the *Somnath*. Dvergsten chose Rocky Point because he had an existing cash pooling agreement between that company and others he owned. Both parties appear to agree that the intervening transfer of the money through AT Offshore was solely Thomas' doing. Thus, Rocky Point asserts that it continues to hold its $2 million for Roy and Mullick's brokerage fees.

Analyzing this story under the WUFTA rubric, it would appear that Traxair initially satisfied the brokers' claim to an upfront commission payment, which Dvergsten agreed to pay because of their exemplary work. Next, TY Global satisfied its existing debt to Dvergsten by transferring the commission funds to Rocky Point, since the brokers (through TY Global, their company) had already agreed to reinvest their fees as soon as they were received. Wis. Stat. § 242.03(1). The brokers' recompense was, it seems, an upfront commission payment (which even Seah calls "unusual," (Docket #72 at 7)), a stake in the *Somnath* enterprise, and keeping the *Somnath* deal afloat by providing equity. Accordingly, Rocky Point's interpretation of the facts, if believed, involves sufficiently corporeal benefits such that each transfer was supported by "reasonably equivalent value." *See Mann*, 920 F. Supp. at 954 (transferor must receive an adequately concrete, if indirect, benefit); *Meieran*, 823 F. Supp. 2d at 888 (statute is satisfied where a preexisting claim of reasonably equivalent value is satisfied through transfer).

Seah counters that the initial transfer from Traxair to TY Global was not justified because the brokerage agreement and the accompanying

invoices for fees are all a sham. This is what Thomas, the owner of both TY Global and AT Offshore, seems to think. Ultimately, the finder of fact may agree with Seah and call Dvergsten's story a ruse.

But Dvergsten has testified otherwise, stating that the transfer was part of a complicated agreement to pay the brokerage commissions up front and then reinvest them into the *Somnath* purchase. The Court is not permitted to weigh the credibility of witnesses in deciding Seah's motion. *Berry*, 618 F.3d at 691; *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (summary judgment "cannot be used to resolve swearing contests between litigants"). Dvergsten's testimony, coupled with Rocky Point's other documentary evidence showing that brokerage services were provided and invoiced, creates a triable issue as to the legitimacy of the initial transfer to TY Global. *Waldridge*, 24 F.3d at 921.

Indeed, the Seventh Circuit has repeatedly admonished district courts for unfairly discounting a witness' supposedly self-serving testimony. *Berry*, 618 F.3d at 691. Personal knowledge is the only relevant requirement to render Dvergsten's testimony admissible at summary judgment, and that requirement being satisfied, the Court cannot look behind his statements to scrutinize their believability. *Id.* "[A]voiding," as it must, "the temptation to decide which party's version of the facts is more likely true," *Payne*, 337 F.3d at 770, the Court finds that, viewing the evidence in Rocky Point's favor, a reasonable jury could return a verdict for it on this question, *see Edinger*, 724 N.W.2d 703, 2006 WL 2864522, at *2 (finding material facts in dispute where defendant's testimony showed that he made the transfer in consideration for services rendered).

Likewise, disputes of material fact preclude a finding that the AT Offshore-Rocky Point transfer was unjustified.[8] Seah again believes that the reinvestment scheme and cash pooling agreement are bogus. Moreover, says Seah, the verbal reinvestment agreement is too indefinite to be enforceable. *See* (Docket #72 at 7–8). Seah's view is that the transfer is fraudulent because AT Offshore had no immediate receipt of anything of monetary value as a result of the transfer.

But here again, Rocky Point has proffered testimony and other supporting evidence to show that (1) the brokers agreed to reinvest their commissions into the purchase of the *Somnath* and (2) as a result, AT Offshore transferred funds to Rocky Point, which Dvergsten designated to receive the funds because of the cash pooling agreement that was designed to streamline financial matters within Dvergsten's vast web of corporations. Perhaps Seah is right that moving money through Rocky Point was impractical or ill-advised as a matter of business judgment, but that is an argument for the jury to consider. Likewise, in contending that the reinvestment agreement is a mere "agreement to agree," which is not enforceable in Wisconsin, *Denil v. DeBoer, Inc.*, 650 F.3d 635, 638 (7th Cir. 2011), Seah is asking the Court to find that the contract does not exist at all, *see* (Docket #72 at 9) ("Mr. Dvergsten's self-serving opinion is hardly sufficient evidence to find [the brokers] have any interest in the $2 million."). Dvergsten's recurring testimony that there was a verbal

---

[8]Both parties treat as anomalous the relationship between TY Global and AT Offshore. However, given this circumstance, the Court, under an obligation to draw inferences regarding the evidence in Rocky Point's favor, concludes that, as Dvergsten testified, AT Offshore was simply a conduit between TY Global and Rocky Point. *See* (Docket #63 at 9–10).

reinvestment agreement makes this impossible. *Berry*, 618 F.3d at 691. Finally, while one may doubt Dvergsten's altruistic motives to hold the $2 million for Roy and Mullick, *see* (Docket #72 at 10), this is what he says, and the Court cannot simply disbelieve him.

The Court, constrained as it is by the standard of review, must view the facts and take inferences therefrom in Rocky Point's favor. Having done so, it is obliged to conclude that a reasonable jury could side with Rocky Point, making judgment in Seah's favor as a matter of law inappropriate. *Mann*, 920 F. Supp. at 954 (in light of standard of review and high burden of proof, summary judgment was not warranted although the defendant's version of events was "unlikely").

### 3.2    Collateral Estoppel

Against all of Seah's claims, Rocky Point offers one additional defense: collateral estoppel, also known as issue preclusion. It reasons that because Seah chose to litigate the issue of fraud against Dvergsten in Singapore and lost, he should be precluded from arguing that fraud occurred in this case. Although the Court has found that factual issues independently prevent summary judgment in Seah's favor, it will close by addressing this defense in light of Rocky Point's concern that it warrants dismissal of Seah's claims. *See* (Docket #66, #69).

Despite Rocky Point's repeated declarations about the importance of this defense, it is plainly without merit. At the outset, the Court notes that the judgment of a court of Singapore binds this Court only to the extent that principles of comity permit it. *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011); *DeGuelle v. Camilli*, 724 F.3d 933, 938 (7th Cir.

2013). There is no requirement that the Court extend any recognition to the Singaporean judgment in this case. *Kashamu*, 656 F.3d at 683. Rocky Point omits any mention of this limitation.

Moreover, under even basic principles of preclusion, the foreign court's judgment would not be entitled to preclusive effect.[9] In general, collateral estoppel precludes re-litigation of issues in a subsequent proceeding when: (1) the party against whom the doctrine is asserted was a party to the earlier proceeding; (2) the issue was actually litigated and decided on the merits; (3) the resolution of the particular issue was necessary to the result; and (4) the issues are identical. *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014).

First, the claims in this case and the foreign case are not the same. While the Singaporean trial concerned whether Dvergsten harbored an intent to defraud creditors, the issue presented in Seah's motion is whether there exist circumstances establishing constructive, not actual, fraud. Notably, Seah has not sought summary judgment on his claim of actual fraud, which is available to him under WUFTA. *See* (Docket #32 at 9–11); Wis. Stat. § 242.04(1)(a) (a transfer is fraudulent if the debtor made the transfer "[w]ith actual intent to hinder, delay or defraud any creditor

---

[9]Although it relies on a Singaporean ruling in a case before a federal court sitting in Wisconsin, Rocky Point overlooks the potentially thorny question of whose law of preclusion applies. It simply cites federal common law. (Docket #63 at 5–6). Seah counters that because this is a diversity case, Wisconsin's law of preclusion should apply. (Docket #72 at 12); *R.E. Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("[W]hen neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits."). The Court need not resolve this problem, for the well-settled principles of preclusion upon which the Court relies are common to federal and Wisconsin law.

of the debtor"). The Wisconsin Supreme Court explained the crucial difference between actual and constructive fraud in *Badger*, noting that for a claim of constructive fraud, "evil purpose" is not relevant; such a claim exists to remedy "transactions that might be considered wrongful toward creditors even if a debtor's intent to hinder, delay, or defraud is not proven." *Badger*, 688 N.W.2d at 447. Thus, Rocky Point misses the objective nature of the present claims. *Id.* ("The focus in 'constructive fraud' shifts from a subjective intent to an objective result.").

Second, even with respect to Seah's claim of actual fraud, it is clear that the Singaporean court applied "the criminal standard" in assessing the claim before it. (Docket #63-1 at 9–10). Neither the judge nor Rocky Point has explained the contours of that standard or how it compares to the evidentiary standard applicable in this case. The Court is left to assume that meeting Singapore's criminal standard placed a heavier burden on Seah than would apply in this case, a fact militating against preclusion. *Guenther v. Holmgreen*, 738 F.2d 879, 888 (7th Cir. 1984) ("It is, of course, well established that issue preclusion may be defeated by shifts in the burden of persuasion or by changes in the degree of persuasion required. For example, the failure to carry a higher standard of proof does not preclude a subsequent attempt to satisfy a lower standard.") (citation omitted); Restatement (2d) Judgments § 28 (1982). Of course, the Singaporean court noted that it would not find sufficient evidence of fraudulent intent "even on the civil standard," but dictum never binds another court. *Kashamu*, 656 F.3d at 688 ("Only findings that are necessary to a court's decision. . .are entitled to preclusive effect.").

A few favorable words plucked from a Singaporean judgment do not make out a valid case for collateral estoppel. It was Rocky Point's burden to establish the requisite identity between this case and that one, and its failure to do so means that the argument is without merit.

## 4.    CONCLUSION

Despite Seah presenting evidence supporting most of the elements of his claims, the heart of this matter remains in dispute: whether Dvergsten's justifications for the transfers in this case are legitimate or manufactured. That is a question that must be decided at trial.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for partial summary judgment (Docket #53) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 6th day of September, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge